UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

CATHERINE V.[1]

        Plaintiff,

        v.

COMMISSIONER,
Social Security Administration,

        Defendant.

Case No. 3:18-cv-00322-JO

OPINION AND ORDER

JONES, Judge:

    Catherine V. (Plaintiff) seeks judicial review of the final decision by the Commissioner of Social Security (Commissioner) denying her application for disability insurance benefits under Title II of the Social Security Act (the Act). This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Because the Commissioner's decision is not supported by substantial evidence, I REVERSE and REMAND for an immediate calculation and award of benefits.

---

[1] In the interest of privacy, this Opinion and Order uses only the first name and the initial of the last name of the non-governmental party or parties in this case. Where applicable, this opinion uses the same designation for a non-governmental party's immediate family member(s).

1 - OPINION AND ORDER

## BACKGROUND

Plaintiff was born in 1974. Tr. 25. She worked from 1998 to 2004 as an officer with the Lincoln City Police, and from 2004 to 2006 as a detective with the West Linn Police Department. Tr. 163. Plaintiff alleges that she has been disabled since October 2006 from a combination of impairments, including shoulder injuries, epilepsy, fibromyalgia, migraines, and the side-effects of medications. Tr. 15. Because Plaintiff was insured for disability benefits under the Act until December 31, 2012, she must show that she was disabled on or before that date to be entitled to benefits. Tr. 13.

After the agency denied Plaintiff's claim for disability benefits, Plaintiff received a hearing before an Administrative Law Judge (ALJ) in February 2017. Tr. 32-51. In May 2017, the ALJ issued his decision, finding Plaintiff not disabled. Tr. 13-26. In December 2017, the Appeals Council denied Plaintiff's request for review. Tr. 1-3. Plaintiff then timely filed this action seeking judicial review of the denial of benefits.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). This court must weigh the evidence that supports and detracts from the ALJ's conclusion and "'may not affirm simply by isolating a specific quantum of supporting evidence.'" *Garrison v. Colvin*, 759 F.3d 995, 1009-10 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)). When the evidence is susceptible to more than one rational interpretation, the court must uphold the Commissioner's decision if it is "supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted). The reviewing court may not affirm the

Commissioner's decision based on a ground that the agency did not invoke in making its decision. *Stout v. Comm'r*, 454 F.3d 1050, 1054 (9th Cir. 2006).

**THE ALJ'S FINDINGS ON THE FIVE-STEP SEQUENTIAL INQUIRY**

The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the ALJ uses a five-step sequential inquiry. *See* 20 C.F.R. §§ 404.1520, 416.920; *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006).

Here, at step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity from the alleged onset date in October 2006 through the date she was last insured, December 31, 2012. Tr. 15.

At step two, the ALJ found Plaintiff had the following severe impairments: degenerative disc disease of the cervical and lumbar spine; rotator cuff syndrome of the left shoulder, status post surgical interventions; degenerative joint disease of the right shoulder, status post surgical interventions; epilepsy; fibromyalgia; and systemic lupus erythematosus. Tr. 15.

At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Tr. 18. The ALJ then assessed Plaintiff's residual functional capacity (RFC), finding Plaintiff could perform sedentary work as defined by 20 C.F.R. § 404.1567(a), subject to the following limitations:

> she could lift ten pounds occasionally and less than ten pounds frequently, carry ten pounds occasionally and less than ten pounds frequently. She could push and pull as much weight as she could lift and carry, but pushing and pulling [is] limited to occasional bilaterally. She could sit up to six hours in an eight-hour day. She could stand and walk up to six hours total in an eight-hour day. She was limited to occasional overhead reaching bilaterally. She was precluded from [climbing]

ladders, ropes or scaffolds. She was precluded from [working] around hazards. such as unprotected heights or heavy moving machinery, and operating a motor vehicle.

Tr. 19.

At step four, the ALJ found Plaintiff could not perform her past relevant work as a police officer. Tr. 24-25.

At step five, the burden of proof shifts from the claimant to the Commissioner. *Bustamonte v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). The Commissioner must show at step five that the claimant can perform other work that exists in significant numbers in the national economy, considering the claimant's RFC, age, education, and work experience. *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). Here, at step five the ALJ found Plaintiff could perform sedentary jobs that exist in significant numbers in the national economy, including document preparer and information clerk. Tr. 25. The ALJ therefore found Plaintiff was not disabled at any time from October 19, 2006, the alleged onset date, through December 31, 2012, the date Plaintiff was last insured. Tr. 26.

## DISCUSSION

Plaintiff argues that (1) the ALJ erred in evaluating the medical opinion of Dr. Sue Lewis; and (2) the ALJ improperly discounted Plaintiff's subjective symptom testimony.

### I. The ALJ's Assessment of Dr. Sue Lewis's Medical Opinion

Plaintiff contends that the ALJ erred in giving little weight to the opinion of Dr. Sue Lewis, an internist who was Plaintiff's primary care physician throughout the relevant period. The ALJ noted Dr. Lewis's opinion that Plaintiff "would have likely been off task 80-90% of the workday and would have missed more than two workdays per month on an ongoing basis during the relevant period," but found that Dr. Lewis's opinion was "not consistent with the medical

evidence of record, which documented good activities of daily living and a positive response to treatment, including surgical intervention, injection therapy and medication management." Tr. 24.

The ALJ is responsible for resolving ambiguities and conflicts in the medical testimony. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). "The medical opinion of a claimant's treating physician is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)). "The Commissioner is required to give weight not only to the treating physician's clinical findings and interpretation of test results, but also to his subjective judgments." *Lester v. Chater*, 81 F.3d 821, 832-33 (9th Cir. 1995).

The ALJ must provide clear and convincing reasons for rejecting the uncontradicted medical opinion of a treating or examining physician, and must provide specific and legitimate reasons for rejecting contradicted medical opinions. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). "'The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Magallanes*, 881 F.2d at 751 (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

Here, the record includes more than 80 pages of medical records from Dr. Lewis, covering the entire relevant period from 2005 through 2013. Tr. 1587-1670. In addition to her own treatment of Plaintiff, Dr. Lewis oversaw Plaintiff's treatment by medical specialists, including orthopedic surgeons, neurologists, and rheumatologists. As Plaintiff's primary care physician,

Dr. Lewis was uniquely situated to evaluate the combined effects of Plaintiff's impairments and of the medications Plaintiff was taking for the impairments.

In 2017, Dr. Lewis completed a form provided by Plaintiff's attorney, stating that Plaintiff suffered from epilepsy, chronic right shoulder pain, chronic pain syndrome, depression, right arm weakness, and neck pain. Tr. 1675. Plaintiff's primary symptoms were weakness and pain in her right shoulder; epileptic seizures; chronic neck pain; anxiety; and frequent hospitalizations. Tr. 1675. Dr. Lewis opined that Plaintiff's symptoms, combined with the effects of the prescribed drugs she took, would have "interfered with her ability to sustain the basic attention and concentration needed to perform even simple work tasks." Dr. Lewis opined that Plaintiff's "attention and concentration would have been impaired to such a degree that she could not have been expected to perform even simple work tasks" 80-90% of a work week. Tr. 1677.

Dr. Lewis wrote a detailed narrative statement explaining her opinion:

I treated [Plaintiff] for a long time as her primary care provider. I saw her in numerous office visits over the years and received and reviewed her medical records for specialty care. She was very engaged in treatment. I based my opinion in the form that she would likely be 80 to 90% off task and that she would likely need to miss at least 16 hours of work a month on the fact that during the time I was treating her she was taking large amount[s] of pain medication to control her pain. She was prescribed oxycodone and fentanyl patches, among other medications, which caused extreme fatigue and sedation. I would notice during our many office visits that she would be sedated. She still experienced a significant amount of pain with use of her arm when taking the medication. If she didn't take her pain medication at all, she could barely use her right arm and she would hold it stiff by her side. I believe that as of December 2012, she would have had significant upper arm limits in both arms and should have only used her right shoulder on an occasional basis throughout a day, should not have engaged in repetitive activities involving forward or lateral reaching, and should not have engaged in pushing or pulling with her upper extremities. Objective evidence, including the 2008 MRI in my records[2], supports these complaints. . . . . She has had multiple surgeries on each shoulder and was told that she needed full replacements due to the severity of the arthritis but was told she was too young. In addition to the surgeries, she had significant reduction of ROM and a fair amount of pain, which would also support that she should have had limited use of the shoulder in any direction, not just overhead.

---

[2] Tr. 1587-88.

6 -OPINION AND ORDER

Tr. 1679. Dr. Lewis continued:

> In addition to her shoulder issues, [Plaintiff] suffered from a seizure disorder that was difficult to control and find the right medication. She was prone to experiencing spontaneous seizures. The medication that she was taking was very sedating for her and did not completely resolve all of her seizures. She also struggled with anxiety and depression because of her health issues causing her to isolate. The combination of these symptoms would likely have caused her to need time off work on a sporadic basis more frequent that 2 days a month . . . . .

Tr. 1679. Dr. Lewis concluded that "[t]here was nothing inconsistent about [Plaintiff's] reporting during the time I treated her. She was so young, but her symptoms and complaints were believable. I think she would prefer to be working." Tr. 1679.

Consistent with Dr. Lewis's opinion, the ALJ found that Plaintiff suffered from multiple severe impairments, including degenerative disc disease of the cervical and lumbar spine, rotator cuff syndrome of the left shoulder, degenerative joint disease of the right shoulder, epilepsy, and fibromyalgia. It is undisputed that Plaintiff required medication to treat these severe impairments. The ALJ found that even with treatment, Plaintiff could perform only a limited range of sedentary work. Tr. 22. The ALJ also found that Plaintiff's epilepsy was generally controlled by anti-seizure medication, noting that when Plaintiff did not take the medication because she was pregnant or trying to conceive, she "experienced some increased seizure activity." Tr. 22.

Regarding the medication side-effects noted by Dr. Lewis, the ALJ found that the effects of "narcotic pain relievers," including oxycodone and fentanyl, precluded Plaintiff "from working around hazards." Tr. 22. The ALJ also noted that the medication Plaintiff took for "diffuse body-wide pain associated with fibromyalgia" caused "drowsiness." Tr. 20. The ALJ did not make findings on the sedating effects of the medications Plaintiff took to treat epilepsy, although the ALJ found that epilepsy precluded Plaintiff "from operating a motor vehicle, . . . and climbing ladders, ropes or scaffolds." Tr. 22.

7 -OPINION AND ORDER

I conclude that the ALJ erred in giving little weight to Dr. Lewis's well-supported and detailed findings on the limitations caused by Plaintiff's combined impairments and her medications, and that the error was not harmless. The ALJ failed to comply with Ninth Circuit's requirement "to give weight not only to the treating physician's clinical findings and interpretation of test results, but also to his subjective judgments." *Lester v. Chater*, 81 F.3d 821, 832-33 (9th Cir. 1995). The ALJ failed to give specific and legitimate reasons for rejecting Dr. Lewis's opinion that Plaintiff "would likely be 80 to 90% off task and that she would likely need to miss at least 16 hours of work a month" because "she was taking large amount[s] of pain medication to control her pain." Tr. 1679. Dr. Lewis also found that the medication Plaintiff took to treat epilepsy "was very sedating for her and did not completely resolve all of her seizures." Tr. 1679. Plaintiff testified at the hearing that because of these side effects, "I have trouble getting the thoughts and the words together, and the appropriate words, the appropriate responses that I'm looking for. I just don't, I don't feel very articulate like I used to be." Tr. 46. Plaintiff also testified that she took naps during the day. Tr. 46.

### A. Plaintiff's Activities of Daily Living

In finding that Dr. Lewis's opinion was not consistent with the medical evidence, the ALJ stated that the record "documented good activities of daily living." Tr. 24. Plaintiff acknowledges that between 2006 and 2012, she did sometimes exercise, go on vacations, drive a car, and care for her two children. Pl.'s Reply 2, ECF No. 18. However, as discussed below, I conclude that the ALJ did not have substantial evidence for finding that Plaintiff's daily activities showed she was not disabled.

The Commissioner argues that "[c]aring for young children without assistance is a demanding task that can undermine a claimant's assertions of disability." Def.'s Br. 6-7, ECF

No. 17 (citing *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001)). The Commissioner characterizes Plaintiff as "tak[ing] care of her children full-time." Def.'s Br. 9.

The facts here are not comparable to the facts in *Rollins,* where the claimant had almost no help from her husband while she was caring full-time for two small children. *Rollins,* 261 F.3d at 857 ("Rollins stated that she attended to 'all of [her] children's needs; meals, bathing, emotional, discipline, etc.' because her husband worked six days a week, usually from early in the morning until 10 p.m."). Here, for child care Plaintiff relied on her husband assisting her every day; on grandparents babysitting three or four days a month; and on day care for the older child. *See Kelsi R. v. Berryhill,* No. 6:17-cv-02046-MK, 2019 WL 2028531, at *4 (D. Or. May 8, 2019) (the plaintiff's ability to care for her children with the assistance of her mother and fiancé did not undermine her assertion of disability). Plaintiff testified that when her first child became too heavy for her to pick up, she put him in day care because she "could no longer take care of him." Tr. 41; Tr. 42 (Plaintiff felt "like a terrible mother" for putting her first child in day care full time because she could not care for him properly by herself). Plaintiff testified, "the kids were being taken care of. Were they getting all that they needed, absolutely not." Tr. 42. Plaintiff and her husband, who is a police officer, could not afford day care for their second child, but by then Plaintiff's left shoulder was stronger after three surgeries. Plaintiff testified that when the second child was an infant, she could "kind of scoop him up with my left hand and bring him over, I could feed him that way." Tr. 47. At the time of the hearing, when the children were 5 and 8 years old, Plaintiff testified that she dressed and fed them in the morning, and her husband took over child care and housework in the evenings.

Plaintiff's husband stated that Plaintiff cared for the children "as best she can" while he was at work, and that when he was home, he "care[d] for the family and house while she rests."

Tr. 197. Plaintiff's husband used his vacation days and sick leave to stay home and care for the children. Tr. 47-48. The ALJ found that Plaintiff's husband's statements about the effects of Plaintiff's impairments were unpersuasive because the husband was reasserting Plaintiff's allegations. Tr. 23. However, the ALJ's finding does not undermine the husband's statements about his significant role in child care, which is supported by other evidence in the record. *See* Tr. 229-39 (daily day care records from 2009 to 2014 for Plaintiff's older son, showing that Plaintiff neither dropped off nor picked up her son at day care while Plaintiff's husband did most of the transportation). I conclude that Plaintiff's ability to care for her two children, with the extensive assistance of her husband and with one child enrolled in day care, is not a specific and legitimate reason to reject Dr. Lewis's opinion about Plaintiff's ability to work.

As to Plaintiff's ability to drive, she testified that she avoided driving as much as possible, and that she "won't drive on the medications." Tr. 36. If she could not get a ride and needed to drive herself, she "pre-planned" her day and did not take immediate release medications in the morning, such as oxycodone and anti-seizure medications. Tr. 36. Plaintiff's ability to drive was limited by the effects of her medications, which is consistent with Dr. Lewis's opinion about the sedating effects of the medications.

As to Plaintiff's ability to exercise, the record indicates that in 2009, Plaintiff took a "baby boot camp class," walking up to three miles a day for several days. Tr. 718. The record does not indicate, however, whether Plaintiff regularly walked three miles per day at other times during the relevant period. The record also shows that a few days after taking the baby boot camp class, Plaintiff sought treatment for "3 days of pain." Tr. 718. In addition, three weeks before taking the class, Plaintiff had received a "glenohumeral injection" for temporary shoulder pain relief. Tr. 994. The physician administering the injection noted that Plaintiff "continues to have pain on a

daily basis that interferes with her life extensively." Tr. 994. Plaintiff's participation in the baby boot camp, together with the infrequent references in the record to exercise, are not substantial evidence undermining Dr. Lewis's opinion on Plaintiff's ability to work during the relevant period.

The ALJ noted that Plaintiff went camping for a week in August 2007 and in July 2010. The Commissioner also refers to medical reports stating that Plaintiff was "looking forward to a great weekend with family camping" in 2007, Tr. 635; Plaintiff contracted an ear infection after camping in 2010; Tr. 651; and Plaintiff suffered back pain and spasms after "tent camping" in 2013. The record does not indicate the extent of Plaintiff's activities during these camping trips, or how frequently she went camping during the relevant period. I conclude that references in the record to camping trips are not substantial evidence contradicting Dr. Lewis's opinion about Plaintiff's ability to work.

### B. Plaintiff's Response to Medical Treatment

The ALJ also found that Dr. Lewis's opinion was not consistent with Plaintiff's "positive response to treatment, including surgical intervention, injection therapy and medication management." Tr. 24. I agree with Plaintiff that the ALJ erred in looking to Plaintiff's impairments in isolation, rather than the impairments' combined effects on Plaintiff's ability to function. Plaintiff does not contend that any one of her impairments would be disabling. Contrary to the applicable regulations and case law, the ALJ failed to consider the combined effect of Plaintiff's impairments regardless of whether any single impairment by itself would have been sufficiently severe to cause disability. 20 C.F.R. § 404.1523(c); *see also Lester v. Chater*, 81 F.3d 821, 829-30 (9th Cir. 1995).

There is no dispute that Plaintiff suffered from several unrelated severe impairments, including shoulder impairments, epilepsy, and fibromyalgia, and that these impairments caused chronic pain and other symptoms, such as seizures, that required treatment with drugs. The ALJ acknowledged that the drugs had a sedating effect on Plaintiff, but rejected Dr. Lewis's opinion on the severity of the effect. I conclude that the ALJ committed harmful error in failing to credit Dr. Lewis's opinion on the severity of the effects of Plaintiff's medications on her ability to work. As the Ninth Circuit has explained, "An integral part of the treating physician's role is to take into account all the available information regarding all of his patient's impairments—including the findings and opinions of other experts. The treating physician's continuing relationship with the claimant makes him especially qualified to evaluate reports from examining doctors, to integrate the medical information they provide, and to form an overall conclusion as to functional capacities and limitations, as well as to prescribe or approve the overall course of treatment." *Lester*, 81 F.3d at 833.

I do find that substantial evidence supported the ALJ's decision to give "significant weight" to the 2010 opinion of Dr. Paul Switlyk, an orthopedic surgeon who treated Plaintiff's shoulder impairments. Dr. Switlyk found that after six surgeries on her right shoulder and three surgeries on her left shoulder, Plaintiff's shoulder impairments "limited [her] to a sedentary category with lifting and carrying on a regular basis, would not be able to use her right shoulder for any repetitive or forceful overhead work or simply pushing and pulling with that arm." Tr. 24. In 2013, Dr. Switlyk found that Plaintiff "remains permanently impaired with the same recommendation for careful limited use of her arm to a sedentary category of lifting." Tr. 986. Dr. Lewis found that Plaintiff's right shoulder impairment was more limiting than Dr. Switlyk found, opining that Plaintiff "had significant reduction of ROM and a fair amount of pain, which

would also support that she should have had limited use of the shoulder in any direction, not just overhead." Because Dr. Switlyk was a specialist, the ALJ reasonably gave greater weight to Dr. Switlyk's opinion on the limitations imposed by Plaintiff's shoulder impairments. However, Dr. Switlyk's findings do not conflict with Dr. Lewis's other findings on Plaintiff's ability to work because he addressed only Plaintiff's shoulder impairments.

I conclude that the ALJ did not provide specific and legitimate reasons for rejecting Dr. Lewis's medical opinion on the effect of Plaintiff's other impairments and of the medications on her ability to work. Dr. Lewis's opinion was based on years of personal observations and on the medical records for the entire relevant period.

## II. The ALJ's Assessment of Plaintiff's Subjective Symptom Testimony

The ALJ found that although Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," her statements about "the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Tr. 22. I conclude that the ALJ failed to offer clear and convincing reasons for rejecting Plaintiff's subjective symptom testimony.

When a claimant has medically documented impairments that could reasonably be expected to produce some degree of the symptoms complained of, and the record contains no affirmative evidence of malingering, as is true here, then "the ALJ can reject the claimant's testimony about the severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996) (citation omitted). Clear and convincing reasons for rejecting a claimant's subjective symptom testimony may "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily

activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 11-cv-583-SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012) (citations omitted); *Joanne C. v. Berryhill*, No. 6:17-cv-01762-SB, 2018 WL 5255230, at *5 (D. Or. Oct. 22, 2018). "Occasional symptom-free periods—and even the sporadic ability to work—are not inconsistent with disability." *Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995).

Under Social Security Ruling (SSR) 16-3p, "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, available at 2017 WL 5180304, at *2. The ALJ must examine "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *4. "SSR 16-3p clarifies that an ALJ cannot use isolated instances of lying or evasiveness to discredit all of a plaintiff's statements." *Dukes v. Berryhill*, No. 3:16-cv-0502-AA, 2017 WL 2292274, at *5 (D. Or. May 24, 2017) (citations omitted).

### A. Medical Evidence

Here, as to Plaintiff's shoulder impairments, she testified that although the pain medication was 80 to 90% effective in reducing her pain, she was still limited in her ability to use her arms. Activities such as sweeping and mopping were difficult, and that "any repetitive motion . . . adds aching, shooting pains, numbness, tingling." Tr. 43. The reduction in pain also does not take into account the sedating effects of the pain medication.

As to Plaintiff's epilepsy, the record shows that Plaintiff has suffered from juvenile myoclonic epilepsy, which was first noted when she was 20 years old, Tr. 244, and has been

shown by abnormal EEG results. Tr. 1172 (April 2001 EEG): Tr. 890 (June 2007 EEG). Plaintiff's epilepsy caused myoclonic seizures, characterized by brief muscle jerks, which at times were strong enough to cause plaintiff to fall or drop objects she was holding. Tr. 843, 847. Plaintiff also suffered from brief, sudden lapses of consciousness. Tr. 275.

Plaintiff was prescribed zonisamide (Zonegran) to treat epilepsy, and clonazepam (Klonopin) as needed for "breakthrough" seizures. Tr. 844. As noted above, although medication generally controlled the seizures with some exceptions, when Plaintiff stopped taking the medication to avoid potential birth defects, she suffered much stronger and more frequent myoclonic seizures, about two per week. Tr. 887 (2007 report of Dr. Norman So, a neurologist, that Plaintiff "now gets prolonged bouts of repeated myoclonic jerks, lasting up to 6 hours."). Also in 2007, plaintiff suffered an absence seizure and failed to recover for more than an hour, remaining unresponsive to commands or questions, and lacking "purposeful movement." Tr. 275. In 2009, Dr. So reported that plaintiff was suffering from three seizures per week, which caused her to "lose tone, drop what she is holding and . . . topple over if standing." Tr. 853. The medical evidence supports Plaintiff's need to take the anti-seizure medication, but the medication was "very sedating." Tr. 1679 (Dr. Lewis report).

Plaintiff also suffers from fibromyalgia, which causes chronic pain. Tr. 713 (2009 hospital chart note). In 2012, Dr. James Smith, M.D., a rheumatologist, examined Plaintiff, finding that all of her fibromyalgia tender points were markedly tender. Tr. 747. Dr. Smith concluded that Plaintiff "clearly has fibromyalgia. In fact, she appears to have what is currently being called central sensitization disorder characterized by multiple issues including insomnia, irritable bowel, and chronic headaches. Comorbid anxiety and depression is also linked with

chronic pain as well as tobacco use." Tr. 748. The ALJ found that the medication Plaintiff took for "diffuse body-wide pain associated with fibromyalgia" caused "drowsiness." Tr. 20.

I conclude that the ALJ failed to give clear and convincing evidence for rejecting Plaintiff's testimony about her symptoms. While there is substantial evidence in the record that Plaintiff's medications were mostly effective in reducing her pain and limiting her epileptic seizures, the ALJ did not give clear and convincing reasons for rejecting Plaintiff's testimony about the side-effects of the medications. This court has explained that an ALJ "must give clear and convincing reasons for rejecting a claimant's testimony regarding the side effects she experiences from her medications." *Salazar v. Astrue*, 859 F. Supp. 2d 1202, 1228 (D. Or. 2012). Because the side effects of medication can significantly impair an individual's ability to work, this court must consider such effects in disability determinations. *Varney v. Secretary of Health & Human Servs.*, 846 F.2d 581, 585 (9th Cir. 1988). "Side effects can be a 'highly idiosyncratic phenomenon' and a claimant's testimony as to their limiting effects should not be trivialized." *Id.* (citations omitted). Here, the ALJ focused on the therapeutic effects of the medications, while not properly considering the effects on Plaintiff's ability to work. I conclude that the ALJ's error was not harmless.

### B. Activities of Daily Living

An ALJ may consider activities of daily living in assessing a claimant's symptom allegations to (1) show a contradiction in previous testimony, or (2) demonstrate that the activities meet the threshold for transferable work skills. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). A claimant, however, does not need to be "utterly incapacitated to be eligible for benefits" because "many home activities are not easily transferable to what may be the more grueling environment of the workplace." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). "[T]he

mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1049-50 (9th Cir. 2001).

As discussed above, Plaintiff's daily activities do not show she is capable of working full-time in a competitive job. I conclude that the ALJ erred in his rejection of Plaintiff's symptom testimony based on her activities of daily living, and that this error was not harmless.

### III. Remand for Further Proceedings or an Award of Benefits

When a court finds that the ALJ committed harmful error, the court may modify or reverse the Commissioner's decision "'with or without remanding the case for a rehearing.'" *Garrison,* 759 F.3d at 1019 (quoting 42 U.S.C. § 405(g)). To determine whether to remand for further proceedings or an immediate award of benefits, the Ninth Circuit uses "a three-part credit-as-true standard, each part of which must be satisfied in order for a court to remand to an ALJ with instructions to calculate and award benefits." *Id.* at 1020. The court first determines whether the "'ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.'" *Treichler v. Comm'r*, 775 F.3d 1090, 1100-01 (9th Cir. 2014) (quoting *Garrison*, 759 F.3d at 1020). Second, if the ALJ has erred, the court should determine whether the record has been fully developed, whether outstanding issues must be resolved before determining disability, and whether further administrative hearings would be useful. *Id.* at 1101. Third, if the court concludes "that no outstanding issues remain and further proceedings would not be useful," the court may "find the relevant testimony credible as a matter of law" and "determine whether the record, taken as a whole, leaves not the slightest uncertainty as to the outcome of the proceeding." *Id.* (citations, quotation marks, and brackets omitted). Even if a plaintiff satisfies the three-part test, the court retains discretion to remand for further

proceedings if the record as a whole creates "serious doubt as to whether the claimant is, in fact, disabled." *Garrison*, 759 F.3d at 1021.

Here, Plaintiff meets the first requirement of the credit-as-true test. As explained above, the ALJ made harmful legal errors when he failed to provide legally sufficient reasons for discounting Plaintiff's subjective symptom testimony and the medical opinion of Dr. Lewis.

Plaintiff meets the test's second requirement. The record here has been fully developed. Because Plaintiff claims disability for a closed period between 2006 and 2012, there is no reason to remand to gather further evidence. *Garrison*, 759 F.3d at 1021.

Plaintiff also meets the test's third requirement. If the improperly discredited evidence is credited as true, the ALJ would be compelled to find that Plaintiff is disabled. The vocational expert testified that a person with Plaintiff's impairments, as described by Plaintiff and by Dr. Lewis, would not be employable in any job in the national economy. Tr. 17; *see Feskens v. Astrue*, 804 F. Supp. 2d 1105, 1122 (D. Or. 2011).

If a plaintiff meets the three criteria of the credit-as-true standard, remand for an award of benefits is appropriate unless "the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled with the meaning of the Social Security Act." *Garrison*, 759 F.3d at 1020-21 (citations omitted). Here, there is no reason for serious doubt on whether Plaintiff is disabled. *See id.* at 1021. I therefore remand for an immediate award of benefits.

## CONCLUSION

Pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is REVERSED and REMANDED for an immediate calculation and award of benefits.

DATED August 27th, 2019.

                                                                  Robert E. Jones
                                                                  United States District Judge